FILED

02/18/2026

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 13, 2025 Session

**SAMUEL PINNER v. JESSIE CONNATSER**

**Appeal from the Fourth Circuit Court for Knox County**
**No. 136395          Gregory S. McMillan, Judge**

**No. E2025-00050-COA-R3-CV**

This action arises from the parties' repeated petitions to modify a permanent parenting plan set forth by the trial court in 2016 regarding co-parenting of the parties' two minor children. Shortly after the children were born, the mother moved to Virginia with the children, and the father remained in Tennessee. The parenting plan designated the mother as primary residential parent and set forth a schedule wherein the children would reside with the mother and attend school in Virginia during the school year, and reside primarily with the father in Tennessee during the summers. The parenting plan further provided that each parent would enjoy co-parenting time with the children while the children were living with the other parent. Since moving to Virginia in 2016, the mother had filed several motions to change venue to the trial court in Virginia. The mother argued that a change of venue was proper, pursuant to Tennessee's version of the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), because the trial court in Tennessee had lost continuing, exclusive subject matter jurisdiction and because Tennessee was an inconvenient forum. At the beginning of trial, after considering Mother's renewed motion to change venue, the trial court determined that it retained subject matter jurisdiction over the matter and that Tennessee was not an inconvenient forum. The trial court then conducted a three-day hearing on the substantive arguments presented in the parties' competing motions to modify and motions for contempt. At the conclusion of the hearing, the court determined that a material change in circumstance had occurred warranting modification of the parenting plan. Additionally, the trial court found the mother guilty of two counts of civil contempt for violating the parenting plan by failing to allow the father his weekend co-parenting time in October 2023 and by failing to timely return the children to the father for the beginning of his summer co-parenting time in 2024. The trial court fined the mother $100.00 for the civil contempt charges. The trial court also ordered the mother to pay the father's attorney's fees in the amount of $15,000.00 for her actions in prolonging the lawsuit and other violations of court orders. Upon careful review, we vacate the two civil contempt charges and resultant fine of $100.00. In all other respects, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Vacated in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY, P.J., E.S., and KRISTI M. DAVIS, J., joined.

Louis J. Battino and Landie Maness Kitts, Knoxville, Tennessee, for the appellant, Jessie Connatser.

Brent R. Watson, Knoxville, Tennessee, for the appellee, Samuel Pinner.


**OPINION**

I.  Factual and Procedural Background

The parties, Samuel Pinner ("Father") and Jessie Connatser ("Mother"), are the parents of two minor children, L.P. and P.P. ("the Children"), who were born in 2012 and 2015 respectively.  In March 2016, Father filed a petition in the Fourth Circuit Court for Knox County ("trial court") to establish parentage, and Mother does not dispute that Father is the biological father of both Children.

Mother relocated to Virginia with the Children in June 2016.  On October 18, 2016, the trial court entered a memorandum opinion and accompanying Permanent Parenting Plan ("PPP") setting forth a co-parenting schedule for the parents regarding the Children. The court designated Mother as the primary residential parent and directed that she could remain in Virginia.  The PPP provided generally that the Children would live during the school year with Mother at her home in Virginia and attend school there, with Father enjoying "extended co-parenting time" during the summer and on "available holidays once a month" during the school year.

Almost immediately following entry of the PPP, the parties commenced filing motions to amend it.  On November 14, 2016, Mother filed a motion seeking a "minimum of four (4) weeks of summer vacation parenting time," a "mutual right of first refusal" in the event the other parent could not spend more than twenty-four hours of his or her co-parenting time with the Children, and her attorney's fees.  On November 15, 2016, Father also moved to alter or amend the PPP to allow Father "up to two weekends total" per month with the Children during the school months and to permit twice-per-week Facetime visits

with the Children for each parent. Additionally, the record reflects that during the first half of 2018, the trial court magistrate entered two orders addressing child support.[1]

In May 2018, as the proceedings continued before the trial court in Tennessee, Mother initiated litigation in the Hanover Juvenile and Domestic Relations District Court in Virginia ("Virginia trial court"), seeking, as petitioner, an amendment to the PPP that would allow her more time with the Children during religious holidays and in the summer. In June 2018, Father again filed a petition in the Tennessee trial court to modify the PPP, alleging that he had adjusted his work schedule to accommodate more visits with the Children in Virginia and that Mother had been uncooperative with Father on a variety of fronts. In June 2019, Mother filed a motion for contempt against Father in the Tennessee trial court alleging various violations of the PPP and a motion to transfer "custody and visitation" with the Children to the Virginia trial court pursuant to the UCCJEA. *See* Tenn Code Ann. §§ 36-6-201, *et seq*.

Other motions for contempt, motions to compel, petitions to modify, and increasingly vitriolic communications between the parties ensued. On July 6, 2018, Mother filed another petition to modify the PPP in the trial court, alleging that Father had refused to follow the provisions of the PPP and requesting that Father's "long weekend visits" with the Children occur in Virginia. Also on July 6, 2018, the trial court entered an order declining to transfer the case to the court in Virginia, noting that there was no reason for a transfer and that both parties had filed motions with the trial court in Tennessee since the trial court's final ruling in October 2016.

On August 6, 2019, the trial court entered a detailed order modifying the PPP but did not file a separate amended parenting plan. The August 6, 2019 order addressed (1) Father's petition to modify the PPP filed on June 1, 2018; (2) Mother's petition to modify the PPP filed on July 6, 2018; and (3) the parties' cross motions for contempt. The trial court dismissed Mother's petition for contempt but granted Father's petition against Mother, fining her $50.00 each for two instances of contempt for failing to include Father in a decision to enroll one of the Children to play baseball. The order included voluminous findings of fact and detailed instructions concerning the parents' poor communication and mutually uncooperative co-parenting. The trial court determined that a material change of circumstance had occurred warranting modification based upon the parents' "failure to adhere" to the PPP, Mother's habit of refusing to share vital information with Father concerning the Children, and "Mother's anxiety," which had caused the Children to adjust "poorly" to the co-parenting schedule. Accordingly, the trial court set forth a schedule instructing that "every third weekend during the summer, Mother may have time from Friday at 6:00 pm to Sunday at 6:00 pm in Knoxville, Tennessee with the minor children." The trial court further ordered that Father would be entitled to an additional weekend with

---

[1] Neither party has raised an issue on appeal concerning child support.

3

the Children if school holiday schedules fell such that they would result in Father's absence from the Children for a period of more than fourteen calendar days. Father was to inform Mother fourteen days in advance if he chose to exercise this extra weekend of visitation in Virginia.

After the trial court modified the PPP, the parties waited less than a full month before re-commencing their litigation against one another. In September 2019, Father filed a motion to modify the PPP pursuant to Tennessee Rule of Civil Procedure 59, and Mother responded in opposition. On October 28, 2019, Mother filed a "Motion to Relinquish Jurisdiction," asking the trial court to transfer jurisdiction to the State of Virginia after resolving Father's Rule 59 motion.

In March 2020, Father filed several motions in rapid succession seeking additional co-parenting time with the Children due to school closures resulting from the COVID-19 pandemic. The trial court granted the first of Father's motions in an order entered on April 17, 2020, allowing Father co-parenting time with the Children from March 22-29, 2020. The court declined to grant Father's subsequent motions for additional time. Father also filed a separate motion in opposition to Mother's motion to relinquish jurisdiction. Meanwhile, Mother filed a motion in the Virginia trial court, seeking an "emergency UCCJEA conference" between the judges from each state due to the COVID-19 pandemic and requesting transfer of the case to the Virginia trial court.[2]

On May 7, 2020, Father filed a motion for civil and criminal contempt against Mother, alleging that Mother had engaged in a constant pattern of disrupting Father's co-parenting time and telephone communications with the Children and had failed to follow the August 6, 2019 order amending the PPP. Mother moved to dismiss the motions for contempt. Father subsequently filed an amended motion, pursuant to Rule 59, seeking to modify the August 6, 2019 court order amending the PPP.

On June 5, 2020, the trial court entered an order granting to Father "two periods of co-parenting time from Thursday until Monday" wherein Father would be allowed to travel with the Children away from Virginia. The trial court specified that one of Father's periods of co-parenting time "shall be the weekend of Memorial Day" and that Mother would pick up the Children from Father in Knoxville on Memorial Day. Also on June 5, 2020, the trial court conducted a hearing relative to Father's Rule 59 amended motion and Mother's motion to relinquish jurisdiction. In an order entered on June 10, 2020, the trial court denied both motions. The trial court clarified that Father would not be "restricted to the city limits of Richmond, Virginia," when he exercised his co-parenting time with the Children and denied Mother's motion to relinquish jurisdiction as moot.

---

[2] It is unclear from the record how or whether Mother's request for an emergency UCCJEA conference was resolved in the Virginia trial court.

During the years that followed, Mother and Father conducted discovery and filed numerous motions to continue, motions to amend the PPP, and motions for contempt against one another. Mother's fourth and fifth attorneys, respectively, withdrew during this time. On October 9, 2023, Mother filed a "Motion to Transfer Custody and Visitation to Virginia" pursuant to the UCCJEA. On September 10, 2024, after she was noticed to an in-person deposition in Knoxville, Tennessee, Mother moved to conduct the deposition via "Zoom" and requested again to transfer the case to the court in Virginia. Mother lodged the same request for a transfer on September 13, 2024, and asked to attend a motion hearing that had been set for September 20, 2024, via Zoom. On October 1, 2024, Mother filed a motion to dismiss all of Father's pending motions for lack of subject matter jurisdiction. In that motion, Mother again argued for a transfer of venue to the Virginia trial court.

In October 2024, the trial court conducted a three-day hearing concerning each of the remaining pending motions in this action and subsequently entered an order and amended PPP on December 18, 2024 ("the Amended PPP"). In the order, the trial court determined that the parents' "inability to work with one another on more than a superficial basis" had been "the greatest impediment" to their ability to follow the PPP and the August 6, 2019 order amending the PPP. The trial court highlighted several instances wherein Mother had denied or obstructed Father's co-parenting time with the Children. The trial court additionally noted that Father's testimony was not consistently credible. Ultimately, the court concluded that Mother's actions had "prolonged and complicated [the litigation] when it did not need to be." Accordingly, the court ordered Mother to pay Father's attorney's fees in the amount of $15,000.00. The court additionally found Mother to be in civil contempt of court on two counts and fined her $100.00.[3] The Amended PPP entered concomitantly with the final order reflected the trial court's attempt to streamline and clarify the details concerning the day-to-day co-parenting schedule.

Prior to the presentation of proof, the trial court denied Mother's motions to transfer the case to Virginia, stating that none of the issues litigated had required testimony from any witnesses in Virginia and that the court's "familiarity with the parties and the history of this case" merited the court's "continuing to exercise continued and exclusive jurisdiction." Mother timely appealed.

## II. Issues Presented

Mother presents the following issues for our review, which we have restated slightly:

---

[3] The trial court found that an award of attorney's fees in Father's favor was appropriate, "in addition to a finding of civil contempt supporting an award of fees." Because the trial court explicitly mentioned specific, sanctionable actions by Mother in addition to the two counts of contempt when it awarded attorney's fees to Father, we affirm the award of fees in the amount of $15,000.00, notwithstanding our decision to vacate the trial court's specific findings of contempt in this Opinion.

5

1.  Whether the trial court erred by determining that it continued to maintain exclusive, continuing jurisdiction over the custody determination and by determining that it was not an inconvenient forum.

2.  Whether the trial court erred by determining that (1) a change in the Children's school calendar in Virginia did not constitute a material change in circumstance warranting modification of the PPP when the change had resulted in the Children having final exams after traveling to Tennessee for the Memorial Day weekend and (2) changes in the Children's ages, resulting in more involvement in sports and extracurricular activities in Virginia, also did not warrant modification.

3.  Whether the trial court erred by holding Mother in civil contempt for failure to adhere to the PPP.

4.  Whether the trial court erred by ordering Mother to pay $15,000.00 of Father's attorney's fees without analyzing whether the fees were reasonable.

Father presents the following additional issue:

5.  Whether Father is entitled to his reasonable attorney's fees on appeal.

III.  Standard of Review

We review a non-jury case *de novo* upon the record with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). We review questions of law, including those of statutory construction, *de novo* with no presumption of correctness. *Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)). A court's decision to hold a person in civil contempt is "entitled to great weight," and is therefore "reviewed using the abuse of discretion standard of review." *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008) (internal citations omitted). To the extent that the trial court's determinations rest upon an assessment of the credibility of witnesses, the determinations will not be overturned absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

This case requires application and construction of the UCCJEA. Concerning the standard of review for actions under the UCCJEA, this Court has previously explained:

Whether a court has jurisdiction under the UCCJEA is a question of law, subject to de novo review with no presumption of correctness. *Staats v. McKinnon*, 206 S.W.3d 532, 542 (Tenn. Ct. App. 2006). A court's decision to accept or decline to exercise jurisdiction under the UCCJEA is a discretionary one. Tenn. Code Ann. § 36-6-222(a); *Staats*, 206 S.W.3d at 554-55; *Steckler v. Steckler*, 921 So.2d 740, 744 (Fla. Dist. Ct. App. 2006). Our review with respect to a trial court's decision to decline to exercise jurisdiction under the inconvenient forum provisions is limited to determining whether the trial court abused its discretion. *In re J.B.W.*, M2007-02541-COA-R9-CV, 2007 WL 4562885, at *3 (Tenn. Ct. App. Dec. 27, 2007); *In re Bridgestone/Firestone*, 138 S.W.3d 202, 205 (Tenn. Ct. App. 2003).

*Busler v. Lee*, No. M2011-01893-COA-R3-CV, 2012 WL 1799027 at *2 (Tenn. Ct. App. May 17, 2012). When one parent resides in the state that made an initial child-custody determination and subject matter jurisdiction in that forum is challenged, "the original decree State is the sole determinant of whether jurisdiction continues." Tenn. Code Ann. § 36-6-217 (Official Comment 1). Hence, "[a] party seeking to modify a custody determination must obtain an order from the original decree State stating that it no longer has jurisdiction." *Id.* This Court may review a trial court's decision regarding subject matter jurisdiction *sua sponte*. Tenn. R. App. P. 13(b); *Ruff v. State*, 978 S.W.2d 95, 98 (Tenn. 1998); *In re Estate of Boykin*, 295 S.W.3d 632, 635 (Tenn. Ct. App. 2008). When addressing statutory interpretation generally, our "primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope." *In re Estate of Tanner*, 295 S.W.3d 610, 613-14 (Tenn. 2009) (internal citation omitted).

Regarding an action to modify a permanent parenting plan, particularly as to the parents' residential co-parenting schedule, our Supreme Court has explained:

A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions. *See In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Thus, appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings. *See* Tenn. R. App. P. 13(d); *In re C.K.G.*, 173 S.W.3d [714,] 732 [(Tenn. 2005)]; *Kendrick [v. Shoemake]*, 90 S.W.3d [566,] 570 [(Tenn. 2002)]; *Hass [v. Knighton*, 676 S.W.2d [554,] 555 [(Tenn. 1984)].

Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the

opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. *Eldridge*, 42 S.W.3d at 88.

*Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013).

## IV.  Subject Matter Jurisdiction under the UCCJEA

Mother asserts that the trial court lost exclusive, continuing jurisdiction over the action because Tennessee is "no longer the children's home state and substantial evidence concerning the children is no longer available in Tennessee." In the alternative, Mother contends that the Tennessee trial court erred when it determined that it was not an inconvenient forum. Father counters that the Tennessee trial court properly retained subject matter jurisdiction because neither parent had sought a change in the primary residential parent status, the necessary witnesses and the evidence were in Tennessee, and Mother never sought testimony from any witnesses in Virginia.

### A.  Exclusive, Continuing Subject Matter Jurisdiction

Tennessee's version of the UCCJEA provides that a court of this state that has made a child custody determination will have exclusive, continuing jurisdiction over the determination until:

(1)     A court of this state determines that neither the child, nor the child and one (1) parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is

no longer available in this state concerning the child's care, protection, training, and personal relationships; or

(2) A court of this state or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this state.

Tenn. Code Ann. § 36-6-217(a) (West June 14, 1999, to current). As pertinent to this action, the official comments to § 36-6-217 provide the following guidance:

If a parent or a person acting as a parent remains in the original decree State, continuing jurisdiction is lost when neither the child, the child and a parent, nor the child and a person acting as a parent continue to have a significant connection with the original decree State and there is no longer substantial evidence concerning the child's care, protection, training and personal relations in that State. In other words, even if the child has acquired a new home State, the original decree State retains exclusive, continuing jurisdiction, so long as the general requisites of the "substantial connection" jurisdiction provisions of Section 201 are met. If the relationship between the child and the person remaining in the State with exclusive, continuing jurisdiction becomes so attenuated that the court could no longer find significant connections and substantial evidence, jurisdiction would no longer exist.

In denying Mother's motion to transfer the matter to the Virginia trial court, the trial court found as follows:

Mother has repeatedly sought for this Court to find that it is an inconvenient forum for determining the issues that parties raise concerning co-parenting time and decision-making authority. The Court disagrees with Mother. None of the issues that this Court heard required testimony from any of the children's teachers, coaches, or adults beyond the parties. Based upon Mother's assertions that she has "free" legal counsel in Virginia, has stated that she will make Father go to court to do something she has already done (travel outside the country), this Court's familiarity with the parties and the history of this case merits this Court continuing to exercise continued and exclusive jurisdiction.

Mother points to the official comments of § 36-6-217(a)(1) to argue that the trial court had lost exclusive, continuing jurisdiction over this action because the relationship between the Children and Father had become so attenuated that the trial court could no longer find significant connections and substantial evidence relative to the Children in Tennessee. In support of her argument, Mother relies on two opinions from this Court with

9

similar fact patterns to the case at hand: *Lee v. Lee*, No. W2003-01053-COA-R3-CV, 2004 WL 3021107 (Tenn. Ct. App. Dec. 20, 2004), and *Graham v. Graham*, No. E2008-00180-COA-R3-CV, 2009 WL 167071 (Tenn. Ct. App. Jan. 26, 2009). In *Lee*, this Court determined that the trial court in Tennessee had lost continuing, exclusive jurisdiction under the UCCJEA's provisions because the mother and child had lived in California since the child was two years old, the father had remained in Tennessee and visited with the child in both California and Tennessee, California had accepted jurisdiction, and "virtually all of the evidence" related to the child was in California. *Lee*, 2004 WL 3021107, at *5. In *Graham*, which relied on the decision in *Lee*, this Court concluded that the Tennessee trial court had lost subject matter jurisdiction pursuant to the UCCJEA when the mother and children had moved to Florida nine years prior to the petition for modification, the father had remained in Tennessee, and all of the evidence regarding the underlying action "concerned events and relationships that took place in Florida." *Graham*, 2009 WL 167071, at *5. Mother argues that the trial court here has lost continuing, exclusive subject matter jurisdiction pursuant to the UCCJEA because, like in *Lee* and *Graham*, the Children in this case have "not lived in Tennessee for a significant amount of time" and "substantial evidence" concerning the Children is "not available in Tennessee."

Father relies on a more recent case, *Parker v. Parker*, No. M2017-01503-COA-R3-CV, 2019 WL 994380 (Tenn. Ct. App. Mar. 1, 2019), to advance his assertions that (1) *Graham* and *Lee* are not dispositive of the instant case and (2) the "determination of whether significant connections and substantial evidence remain in the forum state is a fact-sensitive inquiry." *See Parker*, 2019 WL 994380, at *4. The *Parker* decision included a thorough consideration of *Graham* and *Lee*, which we find instructive:

> A Tennessee court does not lose subject matter jurisdiction merely because the child moves to another state. *See* [Tenn. Code Ann.] § 36-6-217 cmt. Something more is required. Continuing jurisdiction is not lost until the originating court determines that significant connections and substantial evidence are no longer available in the forum state. *Id*. § 36-6-217(a)(1). The official comments to the UCCJEA clarify that the proper inquiry is whether "the relationship between the child and the person remaining in the State with exclusive, continuing jurisdiction [has] become [] so attenuated that the court c[an] no longer find significant connections and substantial evidence." *Id*. § 36-6-217 cmt.

> Mother argues that the court erred in denying her motion because [her child's] only connection to Tennessee is her visitation with Father. Mother relies on two previous decisions of this Court in which we held that Tennessee lost exclusive, continuing jurisdiction after the child at issue had left the state. *See Graham v. Graham*, No. E2008-00180-COA-R3-CV, 2009 WL 167071, at *9 (Tenn. Ct. App. Jan. 26, 2009); *Lee v. Lee*, No. W2003-01053-COA-R3-CV, 2004 WL 3021107, at *5-6 (Tenn. Ct. App. Dec. 29,

10

2004). The determination of whether significant connections and substantial evidence remain in the forum state is a fact-sensitive inquiry. *See* Claudia G. Catalano, Annotation, *Construction and Application of Uniform Child Custody Jurisdiction and Enforcement Act's Exclusive, Continuing Jurisdiction Provision—No Significant Connection/Substantial Evidence*, 59 A.L.R. 6th 161 (2010) (discussing cases applying this provision of the UCCJEA). We conclude that our previous decisions are not dispositive here.

In *Lee v. Lee*, the father filed a petition for contempt and to change custody after the child and his mother had moved to California. *Lee*, 2004 WL 3021107, at *1-2. The record reflected that the child visited the father in "both California and Tennessee, but primarily in California." *Id.* at *5. Father's visitation was later suspended after questions arose about his mental health. *Id*. at *2. We determined that "[t]he record does not contain any evidence of any current connection between the child and this state other than that his father lives here." *Id*. at *5. And "virtually all" evidence pertaining to the child's current welfare was in California. *Id*. Under these circumstances, the Tennessee court "no longer had continuing, exclusive jurisdiction over custody issues related to the child." *Id*. at *6.

Similarly, in the *Graham* case, the father filed a petition for contempt and to modify custody after the children had moved to another state. *Graham*, 2009 WL 167071, at *2-3. We noted that the children had not lived in Tennessee for seven years. *Id*. at *5. The father exercised his parenting time both in Tennessee and the children's new home state. The children never attended school in Tennessee or participated in extracurricular activities in Tennessee. *Id.* Their schools, physicians, friends, and church were all in Florida. *Id.* Unlike the *Lee* case, the father's visitation had not been suspended. Even so, we found that the children lacked a significant connection to Tennessee because their only connection "is that their father lives there and they visit with him during holidays and summers." *Id*. at *9. Based on this conclusion and our determination that all the evidence relevant to the allegations in the father's petition originated in Florida, we concluded that "the courts of Tennessee no longer ha[d] continuing exclusive jurisdiction over custody issues regarding these children." *Id*.

Even these short descriptions of our previous decisions demonstrate that continuing jurisdiction under the UCCJEA depends on the unique facts of each case. To the extent that our decision in *Graham* can be read to hold that a child cannot maintain a significant connection with Tennessee through regular visitation with a parent who still resides in Tennessee, we disagree. Regular visitation may foster a continuing relationship between the child, the parent, and this State.

11

*Id*. at \*4-\*5 (footnotes omitted). The reasoning in *Parker* is clear: whether a trial court in Tennessee retains exclusive and continuing subject matter jurisdiction over a petition to modify a parenting plan or a custody determination pursuant to the UCCJEA depends upon the "unique facts of each case." *See id.*

Having conducted a thorough review of the unique facts of this case, we determine that the trial court properly maintained exclusive and continuing subject matter jurisdiction over the matter pursuant to § 36-6-217. We acknowledge that the Children had lived in Virginia for more than eight years by the time of the hearing conducted in October 2024 and that much of the testimony involved evidence from Virginia, including the Children's school schedule, the requirements of the Children's many extracurricular activities, the circumstances surrounding school pick-up and drop-off, and Father's visitation schedule in Virginia. However, there was also substantial proof presented regarding the Children's relationships and activities in Tennessee, including scheduled summer activities and camps, living arrangements, and the relationships between the Children and Father's girlfriend, Father's girlfriend's teenage children, and the Children's paternal grandmother. Furthermore, most of the testimony presented at trial concerned the contentious relationship between Mother and Father and their mutual inability to compromise or communicate regarding the co-parenting schedule. The voluminous proof regarding the parents' failure to effectively co-parent was available in both Virginia and Tennessee through the parties' own testimony.

Additionally, the trial court had become intimately familiar with the ongoing underlying dispute between the parties due to their continuous litigation in Tennessee since 2016. For these reasons, we find that the Children maintained significant connections with Tennessee such that substantial relevant evidence was still available concerning their relationships and care in this state. *See* Tenn. Code Ann. § 36-6-217(a); *Parker*, 2019 WL 994380, at \*5. Accordingly, the trial court properly retained subject matter jurisdiction pursuant to the UCCJEA.

### B. Inconvenient Forum

As an alternative to her argument that the trial court had lost its exclusive, continuing jurisdiction, Mother argues that the court erred when it determined that it was not an inconvenient forum. The UCCJEA provides that a court of this state "may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum." *See* Tenn. Code Ann. § 36-6-222(a) (June 14, 1999, to current). Section (b) of the statute continues:

> Before determining whether it is an inconvenient forum, a court of this state
> shall consider whether it is appropriate for a court of another state to exercise

jurisdiction. For this purpose, the court shall allow the parties to submit information and shall consider all relevant factors, including:

    (1)    The length of time the child has resided outside this state;

    (2)    The distance between the court in this state and the court in the state that would assume jurisdiction;

    (3)    The relative financial circumstances of the parties;

    (4)    Any agreement of the parties as to which state should assume jurisdiction;

    (5)    The nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

    (6)    The ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence;

    (7)    Whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child; and

    (8)    The familiarity of the court of each state with the facts and issues in the pending litigation.

At the beginning of the hearing on October 1, 2024, Mother argued her motion to change venue and was afforded the opportunity to address in detail each of the factors delineated in § 36-6-222(b). The trial court heard and considered Mother's arguments concerning each of the factors before ruling that the Tennessee trial court was not an inconvenient forum. In the final order, the court explained that none of the issues presented during the hearing had required testimony from witnesses in Virginia, and the court concluded that its "familiarity with the parties and the history of the case" merited continuation of the trial court's exercise of subject matter jurisdiction.

We reiterate that appellate review of a trial court's decision to retain jurisdiction pursuant to the inconvenient forum statute is conducted under the abuse of discretion standard. *See Busler*, 2012 WL 1799027 at *2. Having thoroughly reviewed the record before us, we determine that the trial court did not abuse its discretion in deciding that it was not an inconvenient forum and we will therefore not substitute our judgment for that of the trial court. *See Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) ("The abuse of

13

discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.") (quoting *Myint*, 970 S.W.2d at 927).

## V.  Material Change in Circumstance

Mother contends that the trial court erred when it "did not find that a change in the Hanover County, Virginia public school calendar and the change in age of the children constituted a material change in circumstances" warranting modification of the PPP. Regarding both parties' claims that a material change in circumstance had occurred, the trial court found as follows:

> The first issue to be determined is whether under Tennessee Code Annotated 36-6-10[1](a)(2)(C) either party has shown by a preponderance of the evidence that there has been a "material change of circumstance affecting the [children's] best interest[s]."  Those material changes may include, but are not limited to, "significant changes in the needs of the child[ren] over time, which may include changes relating to age; . . . failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest[s] of the child[ren]."

> Mother avers that the children's activities, schooling and their age make the existing co-parenting schedule not in their best interest.  That argument appears child-focused, but listening to Mother's testimony, her determination of what is and what is not in the children's best interest is substantially influenced by whether she wants something or whether Father is asking.  While Father and his attorney may articulate the issue differently, the Court will state Father's issue as being his inability to engage in the activities he would like to with the children and therefore their best interests are not being served because he is missing opportunities to do things with him that he would like to do.  It is the parties' inability to work with one another on more than a superficial basis that is the greatest impediment.

> The parties' inability to work with one another is **not a material change in circumstances**. . . .

> Tennessee Code Annotated § 36-6-101(a)(2)(C) states that a parenting schedule can be modified to meet the needs of the child[ren], [for a parent's] failure to adhere to the parenting plan, and other circumstances making a change in the residential parenting time in the best interests of the child[ren]. Father has demonstrated that a material change exists.  Mother has denied him co-parenting time that would be his under the parenting plan.  When denying Father these weekends, she has taken the time for herself, scheduling trips and fun activities with one or both children.  Mother has refused Father

14

access to the children's passports without a valid reason or excuse.  Mother has claimed the weekend before Labor Day (rather than the holiday itself as defined in the parties' parenting plan) as hers because it is her "birthday weekend."  Mother scheduled a trip during her summer co-parenting time that she knew would extend into Father's co-parenting time.  To her credit, Mother told Father he could have the children almost immediately upon their return at 11:30 p.m., but her offer was not feasible as it would have involved having the children traveling from Alaska to Virginia and then continuing by car to Knoxville without any break.  Mother's suggestion that the children travel in this fashion belies her claim that it is a hardship for the children to travel seven hours one way to Knoxville for three or four days with Father and then back to Virginia.  Her objection to these weekends is the inconvenience to her.

(Paragraph numbering and footnotes omitted.  Brackets and emphasis in original.)[4]

The trial court found that changes in the children's activities, schooling, and age did not warrant modification, as Mother had requested.  In so determining, the trial court questioned Mother's motives and determined that her requests were not fueled by a desire to reach a solution that was in the Children's best interest but rather were "substantially influenced by whether [Mother] want[ed] something or whether Father [was] asking."  As stated above, credibility determinations such as this one fall soundly within the discretion of the trial court absent clear and convincing evidence to the contrary.  *See Wells*, 9 S.W.3d at 783.  The trial court correctly interpreted and applied the statute to the facts, and the transcript evidence does not contradict the trial court's conclusion; therefore, we will not disturb the court's credibility determination concerning Mother's motives for seeking modification.

Additionally, we determine that the trial court did not abuse its discretion in finding that a material change of circumstance had occurred by reason of Mother's failure to adhere to the PPP.  Testimony revealed that Mother had violated the PPP on several occasions by, *inter alia*, refusing to give Father the Children's passports, registering the Children for extra-curricular activities without consulting with Father, and denying Father his allotted co-parenting time on certain times during the school year.  In consideration of the entire record, we conclude that the trial court's ruling was logical, based on a correct assessment of the evidence, and consistent with the provisions of §36-6-102(a)(2)(C).  *See Armbrister*, 414 S.W.3d at 692-93.  Furthermore, it is not the function of this Court to "tweak" a residential parenting schedule in hopes of achieving a more reasonable result.  *See id.* at

---

[4] Mother was designated primary residential parent in the original PPP, and Father has not raised that as an issue on appeal.  Therefore, the trial court properly analyzed the potential change in residential parenting schedule using the standard set forth in § 36-6-101(a)(2)(C).

693. Accordingly, we will not disturb the trial court's decision to modify the PPP as provided in the court's final order and Amended PPP.

## VI. Civil Contempt

Mother next contends that the trial court erred when it found her guilty of two counts of civil contempt for violating the PPP. According to the Tennessee Supreme Court:

> Civil contempt claims based upon an alleged disobedience of a court order have four essential elements. First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

*Konvalinka,* 249 S.W.3d at 354-55.

Here, the trial court found Mother in contempt for violating the PPP by: (1) "not returning the [C]hildren to Father on time so that he could begin his 2024 summer co-parenting time" and (2) "failing to provide Father with co-parenting time with the [C]hildren in months where they had a day off from school on Friday or Monday that was not a Federal Holiday." In a footnote to the final order, the trial court specifically found Mother guilty of two counts of "civil contempt" for "the weekend in October 2023 and the 2024 summer vacation." On both counts, Mother asserts that her purported acts of violating the PPP were not willful because the terms of the PPP were "ambiguous," and Mother therefore did not realize she was violating them.

With respect to the first count regarding the starting date and time for Father's summer co-parenting time, the PPP provided:

> Father shall have the children from 3:00 p.m. the Saturday following the last day of school until 12:00 p.m. on the 2nd Sunday before school resumes. . . . In addition, the Mother shall have one seven-day period that does not include Father's birthday, the Fourth of July, or Father's Day for vacation with the children. Notice of her selected time must be given by April 1 of each year.

In 2024, the Children's school year ended on Friday, May 31, 2024, according to the Hanover County 2023/24 public school calendar that had been entered as an exhibit at trial. Hence, according to the PPP, Father's summer co-parenting time would normally have begun at 3:00 p.m. the next day, or Saturday, June 1, 2024. However, Mother elected to take her allotted seven-day vacation with the Children on the first week that they were out of school for the summer of 2024. Mother timely informed Father that she would be

taking the Children on vacation during that first week of summer, and Father responded that Mother should return the Children by 3:00 p.m. the next Saturday, June 8, 2024. However, Mother, believing that she could return the Children at any time during June 8, 2024, had already purchased plane tickets for the trip and was not able to return the Children to Father until 11:00 p.m. on June 8, 2024.

During the trial, Mother admitted that she did not return the Children to Father until 11:00 p.m. on Saturday, June 8, 2024, and that Father had "asked about getting them back at 3:00 [p.m.]." However, Mother maintained that she did not believe she was violating the PPP because she had returned the Children to Father promptly at the conclusion of her allotted seven days of vacation. On appeal, Mother contends that the PPP "did not specify what time [Mother's] summer vacation would begin and end." Father counters that Mother's "actions in delaying the [C]hildren's return time to the [Father] were willful" "because she knew of the 3:00 p.m. start time for the summer vacation[.]"

Upon review of this contempt charge, we agree with Mother. There is nothing in the PPP or the August 6, 2019 order amending the PPP specifying what time of day Mother's seven-day summer vacation with the Children should begin and end. The only restrictions provided in the PPP regarding Mother's summer vacation time was that it could not "include Father's birthday, the Fourth of July, or Father's Day" and that Mother was required to inform Father of her chosen week by April 1 each year. The week taken by Mother at the start of the Children's 2024 summer vacation did not fall on any of the restricted days, and Mother timely informed Father of her intent to take her allotted week during the first week of summer.

Because the PPP contained no specified time of day marking the beginning or end of Mother's chosen week of summer vacation with the Children, the PPP was "susceptible to more than one reasonable interpretation" and therefore "cannot support a finding of civil contempt." *See Konvalinka*, 249 S.W.3d at 356. "Ambiguities in an order alleged to have been violated should be interpreted in favor of the person facing the contempt charge." *See id.* (citations omitted). We therefore vacate the portion of the trial court's order finding Mother in contempt for "not returning the [C]hildren to Father on time so that he could begin his 2024 summer co-parenting time."

The trial court also found Mother in civil contempt for "failing to provide Father with co-parenting time with the [C]hildren in months where they had a day off from school on Friday or Monday that was not a Federal Holiday." Concerning Father's co-parenting time on these weekends during the Hanover County school year, the PPP provided:

> Father shall have the co-parenting times set forth below. The schedule is built using the school calendar for the Hanover County Public Schools and is designed to give Father at least one long weekend per month with the children. In any month without a scheduled co-parenting time, he shall

17

further be entitled to additional time with the children one weekend (Friday from school dismissal through return to school on the day school recommences or to the Mother the evening before school recommences at 7:30 p.m.) that month in Richmond, Virginia upon giving the Mother no less than 14 days' notice that he will be coming to Richmond.

The PPP then listed the following holidays and events that were to be Father's exclusive co-parenting time each year during the school calendar year:

Martin Luther King Day
President's Day
Memorial Day
Father's Day
July 4th

In its August 6, 2019 order amending the PPP the trial court clarified Father's weekend co-parenting time during the school year as follows:

In the event there is a period of more than 14 calendar days, due to holidays spanning the first of a month and the end of a month where Father would be without co-parenting time then he shall be entitled to a weekend in Richmond, VA from Friday at 6:00 pm to Sunday at 6:00 pm. Father shall give Mother 14 days' notice of the weekend he would be coming to Richmond, VA.

(Paragraph numbering omitted.)

The trial court's finding of contempt centers on the weekend of October 20-23, 2023, during which Father sought to exercise his "one long weekend per month" co-parenting time according to the above language. The difficulty between the parties arose because the PPP listed no long weekend or holiday in October that would have been automatically designated for Father's co-parenting time. However, on the weekend of October 20-23, 2023, the Children had Friday and Monday off from school for a "student holiday" according to the 2023/24 Hanover County public school calendar.

By its express provisions, the PPP was "designed to give Father at least one long weekend per month with the children" and to further provide that if there was a month without a designated "long weekend" for Father, Father was "entitled to additional time with the children one weekend" during that month. The trial court clarified in its August 6, 2019 order that if Father chose to exercise his weekend co-parenting time during a month when there was no designated long weekend, that Father was to "give Mother 14 days' notice of the weekend he would be coming to Richmond, VA."

18

Because the Children were to be off from school for a "school holiday" during Friday, October 20, 2023, and Monday, October 23, 2023, Father assumed, based on his interpretation of the above language in the PPP, that he should have been entitled to exercise his co-parenting time during that weekend in October. However, because the PPP did not list the weekend of October 23, 2023, as a specific holiday weekend for Father to exercise his co-parenting time, Mother assumed that October 20-23, 2023 was not automatically a long weekend for Father to exercise his co-parenting time, and arranged to take the Children out of town to a football game during that weekend. The record demonstrates that Mother gave Father ample notice that she planned to travel with the Children that weekend.

In December 2023, Father filed a motion for contempt against Mother, arguing that she had violated the terms of the PPP by not allowing him to exercise his co-parenting time with the Children during the weekend of October 20-23, 2023. In the final order, the trial court granted Father's motion for contempt and explained the ruling in a footnote as follows:

> Mother has refused to allow Father to have the long weekends under the school calendar. There have been days when the [C]hildren were out of school on Friday and/or Monday that would constitute a "long" weekend under the school calendar and the existing parenting plan. Mother has taken the position that only Federal Holidays (President's Day, Martin Luther King, etc.) are properly counted as long weekends. Her interpretation is wrong and the Court finds it was motivated by self-interest so that she could have this time with the [C]hildren and not Father.

In an additional footnote, the court found Mother in civil contempt specifically for "the weekend in October 2023[.]"

On appeal, Mother asserts that the PPP was "ambiguous" and that the trial court therefore erred when it held her in civil contempt for not allowing Father to exercise co-parenting time during the weekend of October 20-23, 2023. Mother posits that although the PPP delineated "holidays and designate[d] which parents would have which holiday" during the school year, it made "no mention of 'other school-free days.'" Hence, Mother argues that the PPP did not afford Father the specific long weekend of October 20-23, 2023.

Father counters that Mother was properly found in contempt for "her refusal to provide co-parenting time for [Father] during months where the [C]hildren had a school-free day that was not a Federal holiday, specifically for the weekend in October 2023[.]:" Father cites the above-stated portion of the PPP to argue that "by the plain language of the [PPP], which was designed in contemplation of the [C]hildren's school schedules, for any month wherein there was not scheduled co-parenting time for [Father], he was entitled to a long weekend with the [C]hildren." Father continues:

19

In the years prior to 2023, [Father] typically exercised his October long weekend over the Columbus Day holiday as the [PPP] originally called for the [C]hildren to be off for Columbus Day, but the school system eliminated it and instead implemented student holidays for Friday, October 20, 2023 and Monday, October 23, 2023. Thus, pursuant to the terms of the [PPP], October 2023 has always been a month without a scheduled co-parenting time for [Father] and he was, therefore, entitled to have the parties' children during the school holiday as he had in years past for the school holiday over Columbus Day weekend.

(Record citations omitted.)

Father is correct that, by its plain language, the PPP was "designed to give Father at least one long weekend per month with the children." However, we do not find anything in the PPP stating that Father was entitled to Columbus Day or any long weekend designated as a "school holiday" in the Hanover County public school calendar. Instead, the PPP provided that Father was entitled to exercise his co-parenting time each year on Martin Luther King Day, President's Day, Memorial Day, Father's Day, and July 4th. In addition, the PPP provided that if there was a "period of more than 14 calendar days" during which Father would "be without co-parenting time," Father would "be entitled to a weekend in Richmond, Virginia" with the Children "from Friday at 6:00 p.m. to Sunday at 6:00 p.m." If Father wished to exercise such co-parenting time, the PPP instructed that he was to give Mother "no less than 14 days' notice" that he would be "coming to Richmond" to exercise that time.

The language of the PPP created a conundrum, and it is not surprising that the parties found it difficult to follow. Although the PPP expressly stated that it was "built using the school calendar for the Hanover County Public Schools" and that it was "designed to give Father at least one long weekend per month with the children," the PPP did not expressly provide that Father was automatically entitled to co-parenting time during days designated as "school holidays" that fell on a Friday or a Monday. The PPP also did not provide for any specific long weekends besides those holidays listed in the "Day to Day" co-parenting section. This left the PPP "susceptible to more than one reasonable interpretation" regarding the Children's "school holiday" during the weekend of October 20-23, 2023. *See Konvalinka*, 249 S.W.3d at 356. On one hand, it was reasonable that Father interpreted the PPP's statement that it was "designed to give Father at least one long weekend per month" as conferring upon Father the one weekend in October that was a four-day, school-free weekend for the Children. On the other hand, it was also reasonable that Mother did not consider October 20-23, 2023, to be automatic co-parenting time for Father, given that it was not included in the specific list of holidays provided. As with the first count of contempt, we interpret this ambiguity in Mother's favor. *See id.*

20

Furthermore, testimony at trial evinced that Mother offered other weekends for Father during October 2023, but that Father refused. When cross-examining Father on the witness stand, Mother asked him: "[D]id I not give you multiple options [in October 2023] on ways we could work it out?" Father replied:

> The only option you gave me was not to have a[] long weekend I could take to Tennessee. The only options you gave me is that I would not have a long weekend to take the [C]hildren to Tennessee. . . . My only options were to spend the weekend in Virginia with the kids.

This testimony demonstrated that Mother did not refuse Father his weekend co-parenting time in October 2023. Instead, Father declined to exercise his time because he would not have been able to take the Children to Tennessee during any of the proffered weekends. The PPP does not require that Father be able to take the Children to Tennessee when exercising his weekend co-parenting time during the school year.

For the above stated reasons, we vacate the trial court's finding of civil contempt against Mother for violating the PPP by not allowing Father to exercise co-parenting time during October 2023.

## VII. Attorney's Fees

Mother argues that the trial court erred in ordering Mother to pay Father's attorney's fees in the amount of $15,000.00 because the trial court "did not discuss the reasonableness factors set forth in Rule of Professional Conduct 1.5" and there was "no hearing on the affidavit submitted" by Father's counsel concerning fees. Mother asserts that the trial court erred by predicating the fee award upon Mother's "actions to prolong the case and her failure to act in the best interests of the [C]hildren." Mother urges that such purported failure to act in the Children's best interests is "not a determinative factor for awarding attorney's fees."

Tennessee Code Annotated § 36-5-103(c) (West July 1, 2021, to current) provides:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

"Tennessee courts long have recognized that the decision to grant attorney's fees under section 36-5-103(c) is largely within the discretion of the trial court and that, absent an

abuse of discretion, appellate courts will not interfere with the trial court's finding." *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017) (citing *Keyt v. Keyt*, 244 S.W.3d 321, 334 (Tenn. 2007)).

At the outset, we note that Mother did not object to the reasonableness of the $15,000.00 fees before the trial court, and has therefore waived this issue on appeal. *See Kennedy v. Kennedy*, No. M2016-01635-COA-R3-CV, 2017 WL 2713632, at \*5 (Tenn. Ct. App. June 23, 2017) ("Should a dispute arise as to the reasonableness of the fee awarded, then 'in the absence of any proof on the issue of reasonableness, it is *incumbent* upon the [party challenging the fee] to pursue the correction of that error in the trial court by insisting upon a hearing upon that issue.'" (quoting *Kline v. Eyrich*, 69 S.W.3d 197, 210 (Tenn. 2002))); *see also Moses v. Dirghangi*, 430 S.W.3d 371, 381 (Tenn. Ct. App. 2013) ("It is well settled that issues not raised at the trial level are considered waived on appeal.") (citing *Waters v. Farr,* 291 S.W.3d 873, 918 (Tenn. 2009)).

Even if Mother had not waived the issue of attorney's fees, the fees were proper. Father submitted an affidavit seeking attorney's fees in the amount of $40,097.50, and the trial court, after reviewing the affidavit, awarded to Father $15,000.00 of that amount. The court awarded the fees in part because of Mother's actions during the litigation. Specifically, the court stated that the matter had "been prolonged by the actions of Mother, first asking for time to obtain an attorney (but not doing so), not participating in discovery as ordered, and filing repetitive motions seeking relief that was previously denied." Additionally, the court found that Mother had "acted extremely self-interestedly" by taking the Children "out of school for her own reasons, but not allowing Father the same latitude." It is not within the purview of this Court to second-guess the trial court's considerable discretion in making these determinations relative to an award of attorney's fees. *See Eberbach*, 535 S.W.3d at 475. For the above stated reasons, we decline to vacate the trial court's award of attorney's fees to Father in the amount of $15,000.00.

## VIII. Attorney's Fees on Appeal

Father asserts that he should be awarded his attorney's fees on appeal, arguing that Mother's filing of the appeal was "frivolous" and "designed to cause delay." As this Court has explained:

> The discretion to award attorney's fees on appeal in a proceeding of this nature rests within the discretion of the Court. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). When considering a request for attorney's fees on appeal, we also consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the requesting party sought the appeal in good faith, and any other equitable factors relevant in a given case.

22

*Chase v. Chase*, 670 S.W.3d 280, 304-05 (Tenn. Ct. App. 2022) (quoting *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005)). Upon careful review, we discern that this appeal was not frivolous or filed with the intent to cause delay, and we accordingly exercise our discretion by declining to award Father his attorney's fees on appeal. *See id.*

## IX. Conclusion

For the foregoing reasons, we vacate the trial court's finding that Mother was in civil contempt of court for failing to return the Children to Father by Saturday, June 8, 2024, at 3:00 p.m. and the trial court's finding that Mother was in contempt for refusing Father his co-parenting time in October 2023, because the PPP was ambiguous concerning these issues. Accordingly, we vacate the trial court's sanction against Mother in the amount of $100.00 relative to the contempt charges. In all other respects, we affirm. We decline to award Father his attorney's fees incurred on appeal. This matter is remanded to the trial court for enforcement of the judgment and collection of costs below. Costs on appeal are assessed one-half to the appellant, Jessie Connatser and one-half to the appellee, Samuel Pinner.

s/Thomas R. Frierson, II

_____

THOMAS R. FRIERSON, II, JUDGE